## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**SHERRY STONE-CASTELLANO,**

        **Plaintiff,**

**v.**                                             **Case No.  8:07-cv-944-T-TBM**

**MICHAEL J. ASTRUE,**
**Commissioner of the United States**
**Social Security Administration,**

        **Defendant.**

_____/

## O R D E R

The Plaintiff seeks judicial review of the denial of her claim for Supplemental Security Income payments.  For the reasons set out herein, the decision is affirmed.

### I.

Plaintiff was forty-one years of age at the time of her consolidated administrative hearing in March 2006.[1]  She stands 5' 6" tall and weighed 200 pounds.  Plaintiff has an eighth

---

[1]This case has a lengthy procedural history.  Plaintiff filed an application for Supplemental Security Income ("SSI") payments in June 1997, alleging disability as of May 1, 1997.  *See* (Doc. 97-99).  The application was denied at each level of the administrative process and after hearing before an Administrative Law Judge ("ALJ").  An appeal was taken to this court.  By Order of January 23, 2003, the decision was reversed and the case remanded for further proceedings. (R. 915-24).  During the pendency of those proceedings, Plaintiff filed another application for SSI in June 1999 alleging disability as of June 2, 1997.  *See* (R. 1050-53).  The application was denied through the administrative process.  After hearing, however, the Appeals Council ("AC") remanded the case for further proceedings before the ALJ.  *See* (R. 1044-47).  Thereafter, the claims were consolidated for hearing.  The delay in setting that hearing was caused by Plaintiff's incarceration, which appears to have lasted four years.

grade education and past relevant work as a bartender, hostess, housekeeper, cook, and cleaner.  Plaintiff's June 1997 SSI application asserted disability on the basis of bipolar disorder, violent tendencies, and former drug and alcohol addiction.  (R. 101).  Her June 1999 application additionally claimed degenerative disc and joint disease, osteoarthritis, pain syndrome, and anxiety.  As noted, each of the applications was denied originally and on reconsideration.  There followed a *de novo* hearing before different ALJs.  The hearing on the first application was conducted before Judge Emanuel Edwards on November 5, 1998.  *See* (R. 52-89).  His decision denying benefits was entered April 21, 1999.  *See* (R. 23-37).  The other hearing was conducted before Judge Charles Lockwood on November 15, 2000.  *See* (R. 1386-1411).  His decision denying benefits was entered December 6, 2001.  *See* (R. 906-12). As noted, both decision were ultimately remanded for further proceedings before an ALJ and the claims were consolidated for hearing March 7, 2006.  Plaintiff was again represented by counsel, and she testified in her own behalf.  Additionally, ALJ Tony Eberwein took testimony from a medical expert and a vocational expert.

At the outset, the ALJ indicated that he would review the transcripts from the earlier hearings, and he acknowledged Plaintiff's past history for degenerative disc disease in the lumbar spine, herniation at L4-5, substance abuse, and depression.  He further noted that she was status post gall bladder surgery, appendectomy, hysterectomy, and adenoidectomy.  He next inquired concerning Plaintiff's use of illegal drugs.  By her testimony, she last used illegal substances and alcohol in about 2001.  Plaintiff indicated she was currently serving a two-year probation after release from prison on armed robbery and aggravated fleeing and eluding convictions.

2

At the time of the hearing, Plaintiff was treating once a month with a psychologist and was visited once a week for home counseling, which is presently addressing her rape.  By Plaintiff's testimony, her bipolar condition causes panic attacks a couple of times each week. These attacks last a couple of hours and cause Plaintiff to break out with hives on her arms. She stays depressed and cries often, including crying fits lasting twenty to thirty minutes and occurring four to five times a week.  While she has a tendency for self-mutilation and suicide, she had not had a problem lately.  She indicated that she has a history of aggressively lashing out at people.  Plaintiff additionally described an obsessive/compulsive condition that causes her to be obsessed with doors being locked, with the lights being out, and with washing her hands, which she does "all the time."  The Lexapro prescribed for the condition was not effective, and the doctor was trying her on Prozac.  She takes Trazodone, Seroquel, and Vistaril, which make her sleepy.

Plaintiff also claims a back condition and pain that radiates through her hips and legs, and she must elevate her legs at least two hours every day.  By her account, on a bad day her husband may have to help her with personal care.  She uses slip-on shoes to avoid having to bend.  (R. 1414-24).  When asked whether her anxiety was without agoraphobia, Plaintiff indicated that her problem -- and the only time she gets really upset -- is if she in an enclosed room with a man.

Plaintiff testified that she can lift eight pounds or so, stand for fifteen minutes, walk one-quarter of a mile, and sit for about thirty minutes and then must move about.  She takes naps daily in the afternoon.  She also uses a cane because she fell three times in the last three months due to problems with her hips.

3

(R. 1414-24, 1428-29).[2]

---

[2]At her November 5, 1998, hearing, Plaintiff indicated that her last full-time work was in 1993 as a bartender. She recalled work cleaning at Morton Plant Hospital as well. She could no longer work as a bartender because she could not lift the cases and she could not handle money accurately due to memory problems. Plaintiff testified she was bipolar, had mood swings, violent tendencies, and was very depressed. Because of her mood swings and violent tendencies, she is not sure she could hold down another job. She indicated that her mood swings and violent tendencies have existed since she found her mother dead of a suicide when she was twenty-one. She lost her bartending job when she hit a customer. She recalled another incident where she fought with a fellow employee.

She indicated that sitting caused extreme pain in her lower back after twenty to thirty minutes and after standing fifteen minutes she had to sit or lie down because of pain in her back. Plaintiff also complained of problems with her neck but which were not as severe as the low back. Plaintiff claimed to sleep only four hours a night, and as a result she would nap two to three times a day. Sometimes the pain patches cause her to be nauseous, and her memory has decreased along with the use of medication. She claimed that her right side would go numb and cause her to fall. At that time, Plaintiff was prescribed Lithium, Trazodone, and Xanax. A side-effect from Lithium was tremors in her hands, and she took medication for the tremors as well. Her doctors had also tried three epidural injections in her back which helped some. Plaintiff indicated she had last used methamphetamine three years previously. By her testimony, the pain medication helped some and medicine from her psychiatrist held down her mood swings and took the edge off her temper. The Trazodone helped her sleep at night. (R. 55-76). At that hearing, Plaintiff's husband testified indicating Plaintiff had not been able to work because of extreme pain in her back, her legs seemed to get out of control periodically, and her emotions were up and down on a daily basis. She was depressed and had memory and concentration problems. (R. 76-80).

At the November 15, 2000, hearing Plaintiff indicated she was currently residing at a treatment facility for drug addiction for narcotics and cocaine. By her account, she had been abusing drugs since age twenty-one. She had six years of sobriety but became addicted of narcotics because of her back pain. She had relapsed on cocaine about six months prior to the hearing. Plaintiff also identified an alcohol problem and indicated she had been drinking since she was nine or ten years old. By her account, she had become so addicted to the narcotic medication that she could not function without high doses. Her several pain medications left her sleepy all the time, and she was drinking at home daily. In addition to these problems, she could no longer work because of constant pain in her back, leg numbness, and mental disorders. Plaintiff indicated her addictions, mental problems, and problems with comprehension would prevent even sedentary jobs requiring only light lifting. Plaintiff acknowledged she was attending classes at the treatment center between 8:30 a.m. and 10:00 p.m. Her bipolar condition caused her to alternate between being mad and mean and being nice and outgoing. When depressed, she stayed in her room. Plaintiff again testified she had pain in her low back that radiated to the right leg which goes numb and neck. She described the neck pain as moderate on most days and her low back pain as severe a lot of the time. (R. 1386-1402). Her husband again testified that her bipolar condition, depression, and back pain

4

The ALJ next took testimony from Michael Eastridge, Ph.D., a licensed psychiatrist. By his testimony based on his review of the record, Plaintiff did not meet or equal any listing, and in his opinion, she would be capable of simple work. Counsel for the Plaintiff was unable to formulate an acceptable question of the witness. (R. 1424-28).

Next, the ALJ took testimony from William Harvey, a vocational expert ("VE"). The witness testified on an assumption of an individual limited to lifting eight pounds with a bad back and radiating pain; in need of a sit/stand option at will; capable of only occasionally stooping and climbing stairs but no squatting, kneeling, crawling, or climbing ropes, ladders, scaffolds; unable to reach above her shoulders; limited by reason of mental lapses to doing only simple work; and because of anxiety limited to only occasional contact with the public or co-workers. With such limitations, the VE opined that the individual could not do any of Plaintiff's past work but could work as a surveillance systems monitor, scale attendant, and medical supplies assembler, all sedentary and unskilled jobs. The VE noted that approximately 85% of the sedentary unskilled occupational base was eroded based on the limitations imposed. Counsel for the Plaintiff had no questions. (R. 1429-31).

Also before the ALJ were medical records outlining the Plaintiff's medical history. These matters are addressed adequately by the parties' memoranda and are set forth herein as necessary.

By his decision of April 14, 2006, the ALJ determined that while Plaintiff has severe impairments related to degenerative disc disease of the lumbar spine with mild to low grade central disc protrusion and herniation, early degenerative changes of the cervical spine,

_____

made it difficult for her to work. According to him, Plaintiff was unable to concentrate and finish any job. (R. 1403-07).

obesity, and bi-polar disorder with some anxiety and history of substance abuse in remission, she nonetheless had the residual functional capacity to perform a wide range of sedentary work. Upon this finding and the testimony of the VE, the ALJ concluded that Plaintiff could perform jobs available to her in the local and national economy. Upon this conclusion, the Plaintiff was determined to be not disabled. (R. 887-97A). The Appeals Council considered additional evidence submitted by the Plaintiff but denied Plaintiff's request for review. (R. 328-30).

## II.

In order to be entitled to Social Security disability benefits a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment," under the terms of the Act, is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* at § 423(d)(3).

A determination by the Commissioner that a claimant is not disabled must be upheld if it is supported by substantial evidence and comports with applicable legal standards. *See id.* at § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). The Commissioner must apply the correct law and demonstrate

6

that he has done so.  While the court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions.  *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).

It is, moreover, the function of the Commissioner, and not the courts, to resolve conflicts in the evidence and to assess the credibility of the witnesses.  *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971).  Similarly, it is the responsibility of the Commissioner to draw inferences from the evidence, and those inferences are not to be overturned if they are supported by substantial evidence.  *Celebrezze v. O'Brient*, 323 F.2d 989 (5th Cir. 1963).  Therefore, in determining whether the Commissioner's decision is supported by substantial evidence, the court is not to re-weigh the evidence, but is limited to determining whether the record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude that the claimant is not disabled.  *Miles*, 84 F.3d at 1400; *Bloodsworth v. Heckler*, 703 F.2d 1233 (11th Cir. 1983).

The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct legal standards were applied.  *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988); *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983).

III.

The Plaintiff raises four claims on this appeal.  As stated by the Plaintiff, they are as follows:

7

(1)  Did the ALJ . . . err in failing and refusing to give proper weight to the diagnoses and opinions of claimant's treating and examining physicians?

(2)  Did the ALJ properly assess the claimant's impairments and symptoms both in his questions to the vocational expert and in his assessment of the testimony?

(3)  Did the ALJ properly consider the mental evidence in the case?

(4)  Does the new evidence, submitted to the Appeals Council, justify remand?

By her first claim, Plaintiff complains that this ALJ, like the ALJs who previously reviewed her claims, failed to consider properly the treatment records and opinions of Dr. Robert Jackson, D.O.[3]  By this argument, the doctor treated Plaintiff for nearly two years and found substantial evidence of degenerative joint and disc disease, which was substantiated by both clinical and objective medical evidence.  In Dr. Jackson's opinion, Plaintiff was disabled and unable even to sit through orientation and interviews because of her back condition and bipolar depression.[4]  In sum, Plaintiff urges that the ALJ's conclusion that the opinions were entitled to no weight because not supported by treatment records is unsupported.

_____

[3]As Plaintiff notes, the district court originally remanded the first application for, among other reasons, the failure of the ALJ to articulate his reasons for not giving weight to Dr. Jackson's opinion that Plaintiff was disabled.  (R. 922).  The ALJ's decision on Plaintiff's second application makes no express reference to the opinions of Dr. Jackson.  (R. 906-12).

[4]It appears that Plaintiff initially saw Dr. Jackson in June 1997 for complaints of migraine headaches.  (R. 233-34).  Approximately one month later, x-rays showed straightening of the cervical spine and chronic degenerative joint disease, narrowing at L4-5 and L5-S1 with spondylolysis at L5 on the right side.  Dr. Jackson opined that Plaintiff "is totally and permanently disabled due to degenerative joint disease and osteoarthritis as well as bipolar depression reported."  (R. 248).  Thereafter his treatment notes reflect conservative care for back pain, without much success.  In February 1998, the doctor indicated that Plaintiff could not even sit through orientations for jobs due to her osteoarthritis, degenerative joint and disc disease, myofascial pain syndrome, and cervical/thoracic/lumbar spine somatic dysfunction.  (R. 222).

8

Plaintiff similarly complains that the assessment by Dr. Jose Perez Arce, M.D., a consulting examiner, was improperly considered by the ALJ.  Dr. Arce, like Dr. Jackson, diagnosed Plaintiff with chronic low back pain due to disc disease and radiculopathy, plus fibromyalgia.  By his assessment, Plaintiff could lift less than ten pounds; stand/walk less than two hours in an eight-hour workday and sit less than six hours in an eight-hour workday; with limited ability to push/pull with the legs; no climbing, balancing, kneeling, crouching, crawling, or stooping; and limitations in reaching, handling, and fingering.  (R. 952-56).

By her argument, other examining and treating doctors supported that Plaintiff had severe lumbrosacral impairment and treatment included multiple epidural injections and lumbar nerve blocks.  The only contrasting records were those of the non-examining doctors, which carry little weight.

Regarding her mental health, Plaintiff urges that her records revealed significant drops in her GAF score when under stress.  Scores in the 41-50 range would generally preclude work due to marked limitations.  Plaintiff urges that when all the records and opinions of the treating and examining doctors and psychologists are considered, she is disabled.

In contrast, the Commissioner urges that the ALJ properly discounted Dr. Jackson's opinion on the basis of a lack of support in his own treatment notes and those of other examining doctors, as well as the objective evidence showing some disc bulge but no herniation.  Further, the ALJ fairly considered Plaintiff's mental impairment in light of the extant record as well.

When considering a treating physician's testimony, the ALJ must ordinarily give substantial or considerable weight to such testimony unless good cause is shown to the contrary. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436,1440 (11th Cir. 1997); *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Such a preference is given to treating sources because such sources are likely to be best situated to provide a detailed and longitudinal picture of the medical impairments. *Lewis*, 125 F.3d at 1440. Furthermore, the ALJ must specify the weight given to the treating physician's opinion or reasons for giving the opinion no weight, and the failure to do so is reversible error. *MacGregor*, 786 F.2d at 1053. Good cause for rejecting a treating source's opinion may be found where the treating sources's opinion was not bolstered by the evidence, the evidence supported a contrary finding, or the treating source's opinion was conclusory or inconsistent with his or her own medical record. *Phillips*, 357 F.3d at 1240-41 (citing *Lewis*, 125 F.3d at 1440); *Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987). In this circuit, where the Commissioner has ignored or failed properly to refute the treating physician's testimony, such testimony, as a matter of law, must be accepted as true. *MacGregor*, 786 F.2d at 1053.

In addressing Dr. Jackson's opinions, the ALJ noted the disability opinion was given "little weight" because it was rendered on a matter reserved for the Commissioner and was unsupported by the objective evidence or other evidence of record. Similarly, in addressing Dr. Arce's assessment, the ALJ gave it "little weight" also because of a lack of objective findings, the fact that the doctor's assessment was based on a one-time examination and largely on Plaintiff's subjective complaints as he had no other medical reports, and because it

10

was contrary to the weight of the evidence.  As noted above, in these matters, it is for the ALJ to evaluate and weigh the evidence and to resolve conflicts in the evidence.  Here, after careful review of the cited record, I am obliged to conclude that the ALJ could properly discount these doctors' opinions for the reasons stated in the decision.

As for Dr. Jackson's disability opinion, the regulations do prescribe that the opinion on disability is one left to the Commissioner.  *See* 20 C.F.R. § 416.927(e).  Additionally, for the reasons stated in the decision, there was good cause to give the blanket disability finding lesser weight.  As the ALJ found, the objective evidence at that time did not support the conclusion.  An MRI taken during this period of Dr. Jackson's care revealed only mild diffuse disc bulging with no herniation or foraminal compromise and only minimal facet hypertrophy. (R. 245).  Further, Dr. Jackson's treatment notes did not reflect significant clinical findings supporting a wholly disabling condition.  *See* (R. 222-58).  Other evidence from 1998 was unsupportive of Dr. Jackson's opinion.  As noted by the ALJ, in a report from December 1998, Dr. James Ingram, D.O., noted that Plaintiff's initial subjective complaints from May 1998 were not substantiated  by objective findings and that her current complaints were "grossly unsubstantiated by objective findings."  (R. 1102).  By his examination, there was no evidence of radiculopathy, Plaintiff's pain was out of proportion to what her objective findings revealed, and he had nothing further to offer her but a recommendation for a psychological evaluation.  (R. 1103).  As Plaintiff now urges, there is evidence from this period that Plaintiff underwent epidural injections and nerve blocks (R. 305-12), but the question is not whether she had a low back condition, but whether it was disabling and precluded Plaintiff from performing all work.  A review of other records from this period

11

would allow for the conclusion that Plaintiff did not have a wholly disabling back condition at

that time and that Dr. Jackson's opinion could be and was properly discounted. *See, e.g.,* (R.

313-18, 1108-11, 1147-92).[5]

As for the assessment by Dr. Arce in December 2005, he determined that Plaintiff

had the functional capacity for less than sedentary work.  In rejecting the assessment, the ALJ

again concluded that it was unsupported by the evidence and based almost entirely on

Plaintiff's reporting as the doctor had been provided with no other studies.  After careful

review of the evidence before the ALJ, I am again obliged to conclude that there is substantial

support for the reasons given by him in rejecting the conclusions by this doctor.  It is apparent

that the doctor's assessment was based substantially on the subjective complaints of the

Plaintiff.  He had no other studies to consider and urged a review of the results of the MRI and

nerve conduction studies.  His physical examination revealed limited findings of tender trigger

points, some decreased range of motion, which he attributed to Plaintiff's complaints of low

back pain, and antalgic gate with decreased vibratory sensation in the right leg.[6]  A fair

---

[5]The evidence does reveal that a later MRI taken in December 1998 revealed some mild progression in the spinal condition on comparison with the earlier MRI. *See* (R. 1179-80).  This MRI was taken during care by Dr. Markou, who thereafter continued to treat Plaintiff conservatively with medication and with referrals for physical therapy and orthopedic and pain management consultation.  The pain management consult suggested perhaps an adjustment of medications was in order and noted that two surgeons had determined Plaintiff was not a candidate for surgery.  (R. 1108-11).  The orthopedic consult found Plaintiff suffered from chronic low back syndrome.  The orthopedist, Dr. Roberto Dominguez, M.D., recommended chronic pain management, as there was nothing he could do for her chronic condition.  (R. 1104-05).  None of these examining doctors suggested Plaintiff suffered a disabling condition, nor did they attribute significant functional limitations.

[6]Otherwise, the examination revealed normal musculoskeletal findings.  Muscles were symmetric with 5 over 5 muscle strength equal bilaterally.  There was normal grip strength and fine manipulation. Cranial nerves were also intact.

reading of this report suggests that the severely restrictive RFC assessment was based substantially on her pain complaints.  The treatment records from 1997 through 2000 contained no similar conclusions by any treating or examining doctor nor findings that would support such severe restrictions.  Additional treatment records from Turley Family Medical Center ("Turley") later in 1995 added little.  *See* (R. 961-66).

While the report of the consulting examiner clearly merited careful consideration by the ALJ, he was not obliged to give it special deference.  I find that the ALJ has adequately expressed his reasons for discounting this doctor's assessment to the extent that it found Plaintiff so severely limited, and the ALJ's reasons for discounting the same are supported by substantial evidence.

Plaintiff does not cite any particular mental health report or opinion not appropriately considered by the ALJ but instead urges generally that the ALJ failed to give proper weight to her treating or examining psychologists.  However, apart from that which might be suggested by various GAF scores attributed to Plaintiff, her mental health records before the ALJ did not call for a conclusion that Plaintiff was disabled from all work by reason of her mental condition.  The records before the ALJ primarily included records from Direction for Mental Health.  Those records revealed a primary diagnoses in May 1997 for dysthymia, with alcohol dependence and amphetamine abuse, both in remission.  In August 1997, without explanation, the primary diagnosis was changed to Bipolar Disorder NOS.  Treatment notes through November 1999 revealed various medications were tried over the course of her treatment with varying success.  As the ALJ noted, these records confirmed that Plaintiff's symptoms waxed and waned.  A number of treatment notes included GAF scores which otherwise were not

explained.  Thus, she was assessed with GAF scores ranging from 45 to 62,[7] but these notes, primarily from Dr. James Zenel, M.D., suggested that Plaintiff was fairly stable and functional on medication.  This treating doctor rendered no opinion on Plaintiff's functional capacity that was not considered by the ALJ.

In October 2000, Plaintiff sought treatment for cocaine dependance at The Harbor.  Later, in connection with criminal charges, she underwent evaluations for her competence to stand trial.  *See* (R. 935-47).  Each of these periods of treatment or evaluation was addressed by the ALJ and fairly assessed.

After reviewing all the mental health records before the ALJ, I can find no error in his application of the standards applicable for treating or examining doctors.  To the extent that Plaintiff suggests that the ALJ improperly adopted the opinions of the non-examining doctors over these treating and examining doctors, I find the decision reflects otherwise.

---

[7]GAF is a standard measurement of an individual's overall functioning level "with respect only to psychological, social, and occupational functioning."  AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 32 (4th ed. 1994) (DSM-IV).  A GAF of 61-70 indicates that either some mild depressive symptoms are present or that difficulty in social or occupational functioning exists, a GAF of 51 to 60 means "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers), and a GAF of 41-50 indicates either "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  *Id.*

A low GAF score, however, does not require a finding of disability.  *Seymore v. Apfel*, 131 F.3d 152, at *2 (10th Cir. 1997) (unpublished table decision) ("Contrary to claimant's contention, a GAF rating of 45 may indicate problems that do not necessarily relate to the ability to hold a job; thus, standing alone without further narrative explanation, the rating of 45 does not evidence an impairment seriously interfering with claimant's ability to work"); *accord Cox v. Apfel*, No. 99-2296-JWL, 2000 WL 1472729, at *9 (D. Kan. Feb. 24, 2000).

Plaintiff next complains that the hypothetical questions to the VE did not include limitations imposed by Dr. Jackson or Dr. Arce. However, an ALJ need not include findings in a hypothetical to the VE that the ALJ has rejected properly as unsupported. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004).[8]  As set forth above, the ALJ adequately stated his reasons for discounting the opinions of these doctors and thus was not required to include findings he rejected.

Plaintiff urges next that the ALJ failed to mention her fibromyalgia and also failed to consider her pain, limitations of motion, spasms, need for rest, muscle tenderness, mental confusion, and lack of concentration. In conclusion, Plaintiff complains that the ALJ failed to consider the combined effects of all her impairments.

It is undoubtedly correct that the Act and pertinent case law require the ALJ to consider each impairment, as well as the combined effect of all a claimant's impairments. 42 U.S.C. § 423(d)(2)(B); *Gibson v. Heckler*, 779 F.2d 619, 623 (11th Cir. 1986). However, to the extent that the Plaintiff broadly contends that the ALJ failed to do so, the opinion reflects otherwise. Indeed, the ALJ found that Plaintiff's combination of impairments significantly affected her ability to perform basic work activities and maintain social functioning. (R. 889, 897). I agree with the Commissioner that the ALJ's review of the medical record also reflects his consideration of the combined effects of her impairments. Thus, the broad claim that the ALJ failed to consider the combined effects of her impairments is without merit. *See Jones v.*

---

[8]Furthermore, the court need not address the claim that the hypothetical to the VE was inadequate because Plaintiff failed to raise the issue below. *Id.* As the record reflects, Plaintiff was represented by counsel at the hearing. Although afforded the opportunity to question the VE, counsel inexplicably failed to ask the VE any questions.

*Dep't of H.H.S.*, 941 F.2d 1529, 1533 (11th Cir. 1991) (citing *Wheeler v. Heckler*, 784 F.2d 1073 (11th Cir. 1986)).

Further, the decision reflects the ALJ's rather thorough consideration of the medical records and the findings reflected therein. From this record, the ALJ credited much of what Plaintiff claimed by way of impairment and limitations, just not to the extent that she was wholly unable to work at any job. In considering these records, the ALJ necessarily reviewed each of the subjective limitations or complaints that Plaintiff now suggests were not considered or addressed by the ALJ. My reading of the decision reveals that her pain complaints, limited range of motion, spasms (or lack of the same), and tenderness were all thoroughly reviewed and addressed. (R. 890-95). Plaintiff's contention that the ALJ failed to even mention fibromyalgia is incorrect. The ALJ expressly noted that Dr. Arce assessed Plaintiff with fibromyalgia (and he rejected the same for lack of support in the medical evidence). (R. 892). Likewise, the ALJ noted Plaintiff's claimed need to nap daily, (R. 892-93), and considered the side effects of her medication, noting that the record failed to support significant side effects from medications such as drowsiness. (R. 894). The record also reflects consideration of the limitations to Plaintiff's ability to concentrate and be around others as a consequence of both her mental and physical impairments. Thus, in his hypothetical to the VE and by his decision, the ALJ limited Plaintiff to simple work and only occasional contact with the public or coworkers. (R. 895, 1429). While Plaintiff is correct that the decision does not mention testimony from Plaintiff's husband given at prior hearings, the ALJ indicated that he would consider that testimony, (R. 1414), and there is no showing that he did not. In conclusion, Plaintiff is not entitled to relief on this second claim.

16

By her third claim, Plaintiff notes that although the ALJ found her to suffer from a

mental impairment due to her bipolar disorder with some anxiety, he concluded that the

condition imposed only moderate difficulty in social functioning.  Plaintiff urges that when

she is under stress, the impact is more severe and she has the tendency to lash out at others,

and she is forgetful, and temperamental.  Again, she complains that these severe limitations in

this regard were not included in any questioning of the VE.

I again conclude that the court is bound to accept the ALJ's conclusions on the extent

of Plaintiff's functional limitations arising from her mental condition since such is supported

by substantial evidence.  Apart from her subjective testimony, there is little clinical evidence

to support that her mental functional limitations are as severe as she claims.  By her own

account, she has suffered from depression since age twenty and worked for many years with

the condition.  No treating or examining doctor attributed to her such limitations or restriction

as would suggest the marked limitations she claims from her mental condition.  As noted

above, it is the ALJ's duty to evaluate and weigh the evidence.  Here, the ALJ found evidence

of reduced concentration and social function by reason of her mental state but not to the extent

claimed by Plaintiff.  Plaintiff points to no specific evidence, apart from the various GAF

scores found in the record, to support that she has a disabling mental condition.

In light of the record as a whole, I conclude that the ALJ could look beyond the

unexplained GAF scores to find that Plaintiff's mental condition caused only moderate and

occasional limitations and not the disabling limitations or restrictions she claimed.  As for the

testimony of the VE, the record reveals the ALJ accounted for Plaintiff's reduced

concentration and social functioning by limiting her to work involving simple tasks and only

occasional contact with fellow workers and the public.  With these limitations as well as others, the VE identified a reduced number of sedentary jobs that Plaintiff could do.[9]  To the extent that the ALJ credited Plaintiff with mental functional  limitations, he accounted for the same with the VE.

Finally, Plaintiff urges that new evidence from her period of incarceration in the Florida penal system and updated records from Directions for Mental Health and Turley for the period subsequent to her release first given to the AC clearly establish that Plaintiff's mental and physical impairments did not improve during the period of her incarceration and continued upon her release.[10]  On this claim, she suggests that at least a remand is appropriate for further consideration of this evidence.  In response, the Commissioner urges that the "new" evidence actually supports the decision of the ALJ and that the decision of the AC based on all the evidence is also supported by substantial evidence.

The standard applicable in these circumstances dictates that the AC "must consider new, material, and chronologically relevant evidence and must review the case if the [ALJ's] action, findings, or conclusion is contrary to the weight of the evidence currently of record." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F3d. 1253, 1261 (11th Cir. 2007).  When the AC

---

[9]To the extent that Plaintiff complains about the failure of the ALJ to include more severe limitations in the hypothetical to the VE, I note again that while Plaintiff's counsel had the opportunity to question the witness himself, he chose not to do so.  *See supra* at 14-15, n.7.

[10]The record reveals that subsequent to the last administrative hearing, Plaintiff's counsel submitted medical records from the Florida Department of Corrections for the period from December 2001 to June 2005; from the Turley Center for February 9 through March 22, 2006, and May 8th through November 8, 2006; and from Directions for Mental Health from May 11, 2006, through January 3, 2007, and May 13, 1997, through February 16, 2006.  *See* (R. 340-882).

refuses to consider new evidence submitted to it and denies review, that decision is subject to

judicial review because it amounts to an error of law. *Barclay v. Comm'r of Soc. Sec. Admin.*,

2008 WL 649184 (11th Cir. Mar. 12, 2008) (unpublished) (citing *Keeton v. Dep't of Health*

*and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir.1994)). Otherwise, when reviewing the

Appeals Council's denial of review, the court must "look at the pertinent evidence to

determine if the evidence is new and material, the kind of evidence the Appeals Council must

consider in making its decision whether to review an ALJ's decision.*" Id.* at *4 (citing *Falge*

*v. Apfel*, 150 F.3d 1320, 1324 (11th Cir. 1998)). In circumstances such as these, the court

looks to the whole of the record in deciding whether the decision of the Appeals Council is

supported by substantial evidence.

    With regards to the later filed records, the Appeals Council found the evidence

cumulative of that considered by the ALJ and noted that the same actually supported the ALJ

decision.[11] (R. 328-29). Upon my review and consideration, the records from the Department

of Corrections were not timely presented to the ALJ, and no good cause for the failure to

timely submit the evidence is suggested. In any event, to the extent that they are now part of

the record, my review of the same reveals that the AC's conclusion that such evidence actually

supports the ALJ's decision is correct and that no remand for further consideration of this

evidence is merited. The lengthy records from the Department of Corrections do reveal that

Plaintiff was treated for complaints of back pain and mental health problems throughout her

term of incarceration. However, a review of the reports supports the AC's conclusion that she

---

    [11]In particular, the AC cited a November 2004 MRI which did not reveal disc
herniation (R. 389), and its assessment of mental health records revealing her condition was
stable and that upon her release her GAF was 70-75, indicative of only mild symptoms

was well-maintained throughout her incarceration.  Through a regimen of medication and counseling and physical activity, Plaintiff's mental state remained stable and even improved during the incarceration.  Other than citing to her treatment, Plaintiff does not demonstrate that these records reveal a disabling mental state nor that they called for different administrative decision than that reached by the ALJ and the AC.  Upon my consideration, insofar as she urges that these records call for a remand for further consideration, her contention is without merit.

As for the additional records from Turley, they reflect essentially the same reports, conclusions and treatment as the earlier records.  In one later report, the doctor notes that x-rays did not demonstrate an operable condition and "her condition was stable."  (R. 822).  In another office note, the doctor noted that she reported that her pain medications helped reduce her pain to a level 3 on a scale of 1 to 10 with 10 being the most pain and that physical therapy had been tried, and warm heat and safe exercises were recommended.  (R. 820).  The AC could appropriately find such records to be cumulative and immaterial, as such is defined by the applicable case law.

As for the later records from Directions for Mental Health, those records also appear cumulative and clearly more supportive of the ALJ's conclusion than the Plaintiff's contentions.  The reports from 2005 and 2006 routinely suggest objective findings of normal and appropriate affect, motor movement, and gait, speech, and thought processes.  Memory and concentration are observed to be "good," cognitive functioning grossly intact, and insight and judgment "fair."  *See* (R. 825-28, 343-48).  While these records suggest that Plaintiff

20

continued to need care for her mental health, they in no way call into questions the decisions of the ALJ or the Appeals Council.

In conclusion, the Appeals Council fairly considered the "new" evidence and determined that it did not warrant further review.  Upon my review, the decision of the Appeals Council is supported by substantial evidence.

IV.

Plaintiff has waited many years for the resolution of these claims.  As her able counsel describes, she has had a difficult life, and I am not unsympathetic to her plight and any difficulties the delay may have caused her.  Nonetheless, for the foregoing reasons, I conclude that the decision of the Commissioner of the United States Social Security Administration is in accordance with the correct legal standards and is otherwise supported by substantial evidence.  The decision is affirmed.  Accordingly, the Clerk is directed to enter Judgment in favor of the Defendant and to close the file.

**Done and Ordered** at Tampa, Florida, this 26th day of August 2008.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of record